USA vs. Williams - Motion to Suppress - April 12, 2018

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE WESTERN DISTRICT OF TEXAS
2                          MIDLAND-ODESSA DIVISION

3
UNITED STATES OF AMERICA,              )
4                                      ) Case No. 7:18-CR-037
        Plaintiff,                     )
5                                      ) Midland, Texas
      vs.                              )
6                                      )
ANGELA MICHELLE WILLIAMS,              )
7                                      ) April 12, 2018
        Defendant.                     )
8    _____) 2:56 p.m.

9
                   **TRANSCRIPT OF MOTION TO SUPPRESS**
10              **BEFORE THE HONORABLE DAVID COUNTS**
                    **UNITED STATES DISTRICT JUDGE**
11

12   **APPEARANCES:**

13   **FOR THE GOVERNMENT:**  MS. BRANDI YOUNG, AUSA
                              Office of the United States Attorney
14                            400 W. Illinois, Suite 1200
                              Midland, Texas  79701
15

16   **FOR THE DEFENDANT:**   MR. THOMAS S. MORGAN
                              Law Office of Thomas S. Morgan
17                            1902 West Illinois
                              Midland, Texas  79701
18

19
     **COURT REPORTER:**       MS. ANN M. RECORD, RMR, CRR, CMRS, CRI
20                            200 East Wall Street, Suite 222
                              Midland, Texas  79701
21                            (432) 685-0361
                              ann_record@txwd.uscourts.gov
22
             Proceedings reported by machine shorthand reporter.
23           Transcript produced by Computer-Aided Transcription.

24

25

USA vs. Williams - Motion to Suppress - April 12, 2018

1                          **I N D E X**

2

3    **WITNESSES FOR THE GOVERNMENT:**                    **PAGE**

4    MATTHEW SEDILLO
         Direct Examination By Ms. Young              11
5        Cross-Examination By Mr. Morgan              25
         Redirect Examination By Ms. Young            28
6        Redirect Examination Continued By Ms. Young  41
         Recross-Examination By Mr. Morgan            48
7        Further Redirect Examination By Ms. Young    49

8

9     Argument by Mr. Morgan                          31

10    Response by Ms. Young                           35

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Williams - Motion to Suppress - April 12, 2018

1              **P R O C E E D I N G S**

2              (At 2:56 p.m., proceedings commenced)

3              (Defendant present)

4              THE COURT:  The Court calls U.S. vs. Angela Michelle

5    Williams, MO: 18-CR-37, today on a hearing on Defendant's

6    Motion to Suppress.

7              MS. YOUNG:  Brandi Young on behalf of the United

8    States, Your Honor.

9              MR. MORGAN:  Tom Morgan for Ms. Williams.  We're

10   present and ready.  Although, could I make a statement just for

11   the Court?

12             THE COURT:  Yes, sir.

13             MR. MORGAN:  Before proceeding on this Motion to

14   Suppress, I have talked to my client several times about these

15   proceedings and the Motion to Suppress.  I've talked to Brandi

16   Young, U.S. Attorney, at least twice now.  It is my distinct

17   understanding that if my client waives or abandons the Motion

18   to Suppress and signs a plea agreement and pleads out by next

19   Thursday, April 19th, that the United States Attorney will not

20   pursue a conspiracy involving crack cocaine, ten years to life

21   without parole indictment against my client.

22             Right now, I believe the guideline range is 30 to

23   37 months.  That's total offense level 22 minus 3 for

24   acceptance of responsibility is 19.  Criminal history I is what

25   I believe.  That's 30 to 37.  If she's a II in criminal

Case 7:18-cr-00037-DC   Document 82   Filed 08/24/18   Page 4 of 52

4

USA vs. Williams - Motion to Suppress - April 12, 2018

 1  history, it's 33 to 41.

 2          I have made clear to my client that a conspiracy

 3  accusation like this and crack cocaine, the punishment is

 4  certainly more severe than powder cocaine.  It is ten to life.

 5          The most important thing to me is her freedom.  I

 6  enjoy adversary-type proceedings in the courtroom -- numerous

 7  suppression hearings, 416 jury trials -- but I just do not

 8  think it is advantageous to pursue this Motion to Suppress.

 9  It's my understanding that even if it is granted, the

10  U.S. Attorney is going to the federal grand jury April 25th and

11  that an indictment with her name as a co-conspirator is

12  imminent.  That's even if the Motion to Suppress is granted.

13  If it's denied, same thing.  She is going to go before the

14  federal grand jury, her case, April 25th.  I've also told her

15  she has no chance of winning a jury trial based on these facts.

16          I am prepared for the suppression hearing.  I

17  definitely am.  But I just want to state this to the Court on

18  the record.  I don't know if the Court wanted to have anything

19  to say to my client.

20          The number one thing to me is her freedom; and the

21  smart, safe thing to do is not pursue this Motion to Suppress

22  and sign a plea agreement and plead out by April 19th and avoid

23  a ten year to life without parole conspiracy superseding

24  indictment.  And I've satisfied myself that the United States

25  Attorney is really going to proceed with that indictment.

USA vs. Williams - Motion to Suppress - April 12, 2018

1           I'll leave that to the Court.  She is inclined to go
2   forward when there is nothing good can happen, only very bad,
3   even if she wins the suppression hearing.
4           THE COURT:  Okay.
5           Ms. Williams, do you understand what your attorney
6   has --
7           THE DEFENDANT:  Yes.
8           THE COURT:  -- stated?
9           I'm sorry?
10          THE DEFENDANT:  Yes.
11          THE COURT:  Okay.  Wait until I'm finished talking
12  before you say yes or no, okay, so I can hear you.  And we
13  don't need to talk at the same time for the court reporter so
14  she can take us down one at a time.
15          All right.  You understand what your attorney has
16  stated, correct?  Have you understood what he has stated?
17          THE DEFENDANT:  Yes.
18          THE COURT:  Okay.  Do you have any questions for me?
19          THE DEFENDANT:  No.
20          THE COURT:  Okay.  Or for him?
21          THE DEFENDANT:  No.
22          THE COURT:  I'm sorry?
23          THE DEFENDANT:  No.
24          THE COURT:  Okay.  Is it your desire then to accept
25  the offer of the government, which would be to -- it sounds

USA vs. Williams - Motion to Suppress - April 12, 2018

1  like to waive your Motion to Suppress, enter a guilty plea by

2  next Thursday, the 19th of April, or to decline the

3  government's offer, proceed on your Motion to Suppress -- the

4  suppression hearing -- which sounds like win or lose, whether

5  you win or lose this, the government is telling you that they

6  are planning to go to -- that that deal is off the table.

7  They're planning to go to a federal grand jury for a

8  superseding indictment.

9          You're faced right now with a two-count indictment.

10  Each count carries up to 20 years in federal prison.  The

11  guidelines -- it sounds like Mr. Morgan, who is very

12  seasoned -- probably the most seasoned and experienced attorney

13  we have here.  And in the state, probably, I would guess.

14          And so he's telling you that he thinks what the

15  guidelines are, are 30 to 37 or 33 to 41, depending upon a

16  criminal history category, which is really not up to him to

17  decide.  That's why he's telling you one of the two versus the

18  superseding indictment which would possibly -- that conspiracy

19  may be a ten-year mandatory minimum to life imprisonment.

20          So even if you were found guilty of the conspiracy

21  later and your guidelines were as low as he thinks they are

22  now, you have a ten-year mandatory minimum.  Unless there is,

23  you know, certain factors that all coalesce and work out

24  together, you can't get below that ten years.  You can in

25  certain circumstances, but rare.  And so you would be at

Case 7:18-cr-00037-DC   Document 82   Filed 08/24/18   Page 7 of 52

7

USA vs. Williams - Motion to Suppress - April 12, 2018

1   120 months, which is ten years.

2            Okay.  Do you understand all of that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Okay.  Is it your desire then to accept

5   the government's offer or to decline it?

6            THE DEFENDANT:  Decline it.

7            THE COURT:  Okay.  Have a seat.

8            Ms. Young, go right ahead.

9            MS. YOUNG:  And may I put one thing on the record,

10  Your Honor, just for clarity?

11           THE COURT:  Sure.

12           MS. YOUNG:  Mr. Morgan is actually the third attorney

13  that's been on this case.  The United States did extend the

14  same exact offer to Ms. Carpenter, who indicated that -- there

15  were negotiations and so actually asked that we not seek an

16  indictment.  There was going to be a potential resolution to an

17  information.

18           Ms. Williams hired Mr. Rogers, who made an entry of

19  an appearance and replaced Ms. Carpenter.  The government, as

20  courteousness to each attorney -- we don't just say, "Well,

21  that offer is off the table because a new attorney is here."

22  We extended that same offer.  Then Mr. Morgan was retained to

23  replace Mr. Rogers, who asked to withdraw.

24           So while it may appear on the record that we're at a

25  late date talking about superseding indictment and those sort

USA vs. Williams - Motion to Suppress - April 12, 2018

1  of things, that's out of courteousness to the defendant and to

2  the various defense counsel.  The government has been prepared

3  to do that since January; but in an attempt to reach a

4  resolution, we have continued those negotiations.

5          So I just wanted to put that on the record because I

6  don't want the appearance that we are at a suppression hearing

7  and the government is saying, "Well, you have to do this or you

8  have to do that.  Otherwise, we're going to do something else."

9  The government has been very transparent since January.  It's

10  just been that we've had three different defense counsels that

11  we've tried to work through the same issues with.

12          THE COURT:  Mr. Morgan is retained also, correct?

13          MS. YOUNG:  Correct, Your Honor.

14          THE COURT:  Okay.

15          And, Ms. Williams, I'll just tell you that, you know,

16  some people in your position who are accused and if the

17  government comes to them, "Well, we've got a deal for you.  And

18  if you take it, great.  If you don't, we're going to go back to

19  the grand jury."

20          And I've had people stand before me -- you didn't say

21  it today -- stand before me and say, "Well, they're extorting

22  me.  They're trying to pressure me and all that."

23          The government isn't going to be penalized for

24  seeking maybe a lesser charge originally to try to come to some

25  agreement with you, and -- but if you and the government don't

USA vs. Williams - Motion to Suppress - April 12, 2018

1  come to an agreement, they have every right to seek a grand

2  jury's return of a true bill of indictment -- or superseding

3  indictment in this case.  Because if you want a trial, you get

4  a trial.  But they have a right to a trial also.  If they're

5  going to go to trial, they're likely going to take the biggest

6  bite at the apple as they can.

7         So the mere fact that they're laying it out for you

8  doesn't mean they're extorting you in any way because you still

9  have your full range of options, which you've chosen -- you've

10  already made a choice today.  And so just so you realize that

11  and we'll go forward.

12         And if you, of course, are convicted of the

13  superseding indictment, some day when you're sitting in prison

14  and you decide, "Gee, I would like to go back to April 12,

15  2018, and take that offer, take that deal," then you've got to

16  file a writ or a grievance of some kind saying that somebody

17  didn't do what they were supposed to do.  Mr. Morgan didn't do

18  what he was supposed to do or he did something he shouldn't

19  have done.  Same for Ms. Young.  Same for the court.

20         Typically, it's that your lawyer just, you know --

21  the argument or the grievance is typically that my lawyer just

22  was ineffective.  And so we'll come back at that time and

23  listen to this recording -- or look at the transcript and see

24  that, no, you knew everything.  It was all in front of you, and

25  you made your decision, and so you'll be stuck with that.  If

USA vs. Williams - Motion to Suppress - April 12, 2018

1  you, of course, beat the case and walk away acquitted, then you

2  don't have to worry about any of that or any of us anymore.

3          Ms. Young, let's go forward.

4          MS. YOUNG:  Thank you, Your Honor, and I appreciate

5  it.

6          MR. MORGAN:  Could I state one thing for the record

7  before we begin?  This week I did receive the lab report --

8          THE COURT:  Oh, okay.

9          MR. MORGAN:  -- from the chemist.  It's between 26

10  and 27 grams of cocaine base.  So I want the Court to know

11  that.  We did receive it, and I did go over that with

12  Ms. Williams.

13          THE COURT:  Very well.  Thank you.

14          Now, Ms. Young, let's go ahead.

15          MS. YOUNG:  Okay.  Thank you, Your Honor.  The United

16  States will call Detective Matthew Sedillo.

17          THE COURT:  Detective Sedillo, if you would come up.

18          (Witness sworn by the clerk at 3:06 p.m.)

19          THE CLERK:  Would you state your name and spell your

20  last name, please.

21          THE WITNESS:  Matthew Sedillo, S-E-D-I-L-L-O.

22          THE COURT:  Go ahead, Ms. Young.

23          MS. YOUNG:  Thank you, Your Honor.

24

25

Sedillo - Direct Examination - April 12, 2018

1                    **MATTHEW SEDILLO,**

2         **GOVERNMENT'S WITNESS SWORN AT 3:06 p.m.**

3                    **DIRECT EXAMINATION**

4   BY MS. YOUNG:

5   Q.   Detective, how are you employed?

6   A.   With the Midland Police Department.

7   Q.   And how long have you been with Midland Police Department?

8   A.   Around 11 years.

9   Q.   And where are you currently assigned?

10  A.   To the narcotics division.

11  Q.   How long have you been in the narcotics division?

12  A.   Around four years.

13  Q.   Okay.  I know you say "around."  Prior to the narcotics

14  division, what unit were you assigned to?

15  A.   I was working property crimes.

16  Q.   And that's a detective in another area, correct?

17  A.   Yes, ma'am.

18  Q.   Prior to that, were you also part of a specialized unit?

19  A.   Yes, ma'am.

20  Q.   What was that?

21  A.   The directed patrol team.

22  Q.   Does that team work in conjunction with the narcotics

23  fairly frequently?

24  A.   Yes, ma'am.

25  Q.   So what would you say your sum total in your 11 years with

Sedillo - Direct Examination - April 12, 2018

1  the police department you've been involved in narcotics

2  investigations?

3  A.    Around seven years.

4  Q.    Okay.  Now, did you have cause to receive -- or did you

5  receive information regarding an individual that you

6  subsequently learned her name was Angela Williams?

7  A.    Yes, ma'am.

8  Q.    Detail for the Court the initial information you received.

9  A.    We received information that she was selling crack

10  cocaine.

11  Q.    And crack cocaine is also known here in federal court as

12  cocaine base or cocaine base, crack?

13  A.    Yes, ma'am.

14  Q.    So if I slip and use them interchangeably, we're talking

15  about the same thing, correct?

16  A.    Yes, ma'am.

17  Q.    Okay.  This information you received, I'm not asking from

18  who, but how you did receive it?

19  A.    From a cooperating source.

20  Q.    Now cooperating sources, for the record, are what?

21  A.    An individual giving us information.

22  Q.    Now, sometimes those -- those individuals can have various

23  statuses, correct?

24  A.    Yes, ma'am.

25  Q.    What are some of those?

1   A.   Some just give information.  Some actually go further and

2   can do controlled buys of narcotics from individuals that

3   they're claiming are selling narcotics.

4   Q.   In this instance, did -- was this cooperating source, or

5   individual, were they able to actually give you information

6   regarding Ms. Williams' narcotics trafficking activities?

7   A.   Yes, ma'am.

8   Q.   And what did they relate?

9   A.   They advised that she sells crack cocaine out of her

10  residence on the east side of town.

11  Q.   What town are we talking about?

12  A.   Midland, Texas.

13  Q.   Based on that information -- and let me ask you:

14  Approximately when did you receive this information?

15  A.   I want to say around the beginning of the year.

16  Q.   Okay.  And you say "the beginning of the year," beginning

17  of 2017 or the --

18  A.   2018.

19  Q.   Okay.  Let me ask you a question:  Were you involved in a

20  controlled purchase from Ms. Williams?

21  A.   Yes, ma'am.

22  Q.   If your records reflect that that occurred in December of

23  2017 --

24  A.   Okay.  Yes, ma'am, that would be correct.

25  Q.   That would be correct.  Okay.

Sedillo - Direct Examination - April 12, 2018

1            After you received the information, what did you do?

2  A.   We conducted a controlled buy.

3  Q.   And detail for the Court exactly what that means and what

4  you did.

5  A.   We used a cooperating source to go purchase a quantity of

6  crack cocaine from Ms. Williams from her residence.

7  Q.   Now, prior to doing that, are there certain steps that you

8  do?

9  A.   Yes, ma'am.

10  Q.   Okay.  What do you do?

11  A.   We have to check the vehicle of the cooperating source and

12  their person to make sure they don't have any illegal

13  contraband on them.

14  Q.   Did you do that?

15  A.   Yes, ma'am.

16  Q.   Did you find any illegal contraband?

17  A.   No, ma'am.

18  Q.   What else do you do?

19  A.   We actually give the cooperating source marked money, and

20  we give them a recorder to record the buy.

21  Q.   Now, when you say "marked money," do you really write on

22  it and mark it?

23  A.   No, ma'am.

24  Q.   Okay.  What do you do?

25  A.   We take a picture of it.

1  Q.    Why are you doing that?

2  A.    To document the serial numbers in case we come across them

3  at a later date.

4  Q.    So it's marked because United States currency, each bill

5  has a unique serial number.   Is that a fair statement?

6  A.    Yes, ma'am.

7  Q.    Was that done in this case?

8  A.    Yes, ma'am.

9  Q.    So after the cooperating source was provided currency and

10  the serial numbers were documented and provided a recording

11  device, what did you do next?

12  A.    We then went to a residence where Ms. Williams was at, and

13  the cooperating source purchased a quantity of crack cocaine

14  from Ms. Williams.

15  Q.    What were you doing while the cooperating source was

16  entering a residence and purchasing cocaine base, crack?

17  A.    We were conducting surveillance.

18  Q.    And does that mean surveillance back at an office or out

19  in the street?   What does it mean?

20  A.    Out there in the streets.

21  Q.    Okay.   After the purchase of cocaine base, crack,

22  occurred, what did you do?

23  A.    We met backup with the cooperating source.   She then

24  turned over the crack cocaine to us and the recorder.   She was

25  checked -- or the cooperating source was checked and the

Sedillo - Direct Examination - April 12, 2018

1  vehicle to make sure there wasn't any illegal contraband left

2  behind or kept, and there wasn't.

3  Q.   Okay.  Now, how were you able to determine that the

4  individual -- well, let me back up.

5       Did the cooperating source provide you the quantity

6  of crack cocaine?

7  A.   Yes, ma'am.

8  Q.   Did you then speak to or interview that cooperating

9  source?

10 A.   Yes, ma'am.

11 Q.   What did they relate had occurred?

12 A.   That they had purchased the crack cocaine from

13 Ms. Williams inside the residence.

14 Q.   At this point had you positively identified Ms. Williams?

15 A.   Yes, ma'am.

16 Q.   Were you able to determine not only the identity, but the

17 owner of the residence that you were purchasing the cocaine

18 base, crack, at that point in time?

19 A.   No, ma'am.

20 Q.   So does anything else happen that day in December of 2017?

21 A.   No, ma'am.

22 Q.   Okay.  Now, let's fast forward to January of 2018.

23 A.   Okay.

24 Q.   Was your investigation continuing in regards to the

25 cocaine base, crack, trafficking activities of Ms. Williams?

1   A.   Yes, ma'am.

2   Q.   In relation to that, did you become aware that the Midland

3   Police Department as well as other agencies were involved in

4   investigating individuals distributing and manufacturing

5   cocaine base, crack?

6   A.   Yes, ma'am.

7   Q.   When you're working an investigation, what do you try to

8   do?

9   A.   We try to share information with other agencies just to

10  see -- in case if they have an ongoing investigation with that

11  individual.

12  Q.   At some point in time -- did you do that in this case --

13  or attempt to do that in this case?

14  A.   Yes, ma'am.

15  Q.   And at some point in time, did you receive information

16  regarding Ms. Williams' source of supply?

17  A.   No, ma'am.

18  Q.   Okay.  Were you able to ascertain -- and I know you said

19  no.  But at that point, you were not able to ascertain who or

20  where they may be located, correct?

21  A.   No, ma'am.

22  Q.   What happened January 2, 2018, that caused you to go to

23  Odessa, Texas?

24  A.   We were conducting surveillance of Ms. Williams' vehicle.

25  We observed it go to -- or start traveling towards Odessa.   In

Sedillo - Direct Examination - April 12, 2018

1   Odessa, it went to an address -- a street which is known for

2   the distribution of crack cocaine.  Ms. Williams' vehicle was

3   on the -- that street for a short period of time, which is

4   pretty consistent with the sale of a narcotics transaction.

5   After that, Ms. Williams left the area and headed back towards

6   Midland, Texas.

7   Q.   Okay.  So I want to ask you a few things to clarify for

8   the record.

9          Now, you said this area is -- did you name the

10  street?

11  A.   Yes, ma'am.

12  Q.   And you said it was what?

13  A.   Wabash.

14  Q.   Did you inquire -- at that time when the vehicle that you

15  believed to be driven by Ms. Williams was on this street, did

16  you contact other law enforcement agencies to see if they were

17  aware of this address or this area?

18  A.   Yes, ma'am.

19  Q.   Who did you contact?

20  A.   Detective Dolan.

21  Q.   Now, at the time, where was Detective Dolan working?

22  A.   DEA.

23  Q.   So he was a task force officer at DEA, correct?

24  A.   Yes, ma'am.

25  Q.   And did you give him the information that you had

1   regarding Ms. Williams' whereabouts at that specific moment on

2   January 2, 2018?

3   A.   Yes, ma'am.

4   Q.   And I also want to clear up that you said you were doing

5   surveillance.  At some point in time, did you physically see

6   the vehicle you believed Ms. Williams was driving?

7   A.   Yes, ma'am.

8   Q.   And where did you first observe the vehicle?

9   A.   I first observed it on the outskirts of Odessa.

10  Q.   And I'm not asking -- I should rephrase that question

11  better.

12        Was the vehicle already in Ector County, or were you

13  able to find it here in Midland County?

14  A.   It was already in Ector County.

15  Q.   Okay.  And I understand Ector and Midland are right there

16  so I'm not trying to tie you, but prior to the arrival on

17  Wabash, correct?

18  A.   Correct.

19  Q.   Okay.  After you made these observations, and you said the

20  vehicle was only present at this residence for a short period

21  of time, what did you do?

22  A.   We continued surveillance and then basically waited until

23  she entered Midland County and requested a patrol unit to

24  assist with possibly making a traffic stop.

25  Q.   Okay.  And at that point in time, had you determined or

Sedillo - Direct Examination - April 12, 2018

1  decided that you were going to initiate a traffic stop?

2  A.    I was hoping we could.

3  Q.    Okay.  What do you mean?

4  A.    Well, I was -- based on my training and experience, I

5  believed a narcotics transaction occurred.  So my goal was to

6  try and get the vehicle stopped for a traffic violation.

7  Q.    Okay.  Now, you said a couple of things that are going to

8  be important later for the record so I want to clarify.  You

9  said you believed, based on your training and experience, a

10  narcotics transaction had occurred, correct?

11  A.    Yes, ma'am.

12  Q.    But then you also said you were attempting to stop the

13  vehicle if you observed a traffic violation?

14  A.    Yes, ma'am.

15  Q.    Okay.  While you were following Ms. Williams' vehicle,

16  what, if any, traffic violations did you observe?

17  A.    We observed two traffic violations.

18  Q.    Now, you said "we."  Were you in a marked unit or an

19  unmarked unit?

20  A.    It was an unmarked unit.

21  Q.    Was someone in the unit with you?

22  A.    Yes, ma'am.

23  Q.    Who was that?

24  A.    Detective Chesworth.

25  Q.    Is he also assigned to the narcotics division?

Sedillo - Direct Examination - April 12, 2018

1  A.    Yes, ma'am.

2  Q.    Okay.  And once in Midland County, what traffic violations

3  did you observe the vehicle that you believed was driven by

4  Ms. Williams commit?

5  A.    Failed to maintain single lane and failed to signal.

6  Q.    And are you aware that the Texas Transportation Code

7  specific sections, that those are violations of Texas state

8  traffic laws?

9  A.    Yes, ma'am.

10  Q.    And you said the first one you observed was which one?

11  A.    Failed to maintain a single lane.

12  Q.    And just for the record, what does that mean?

13  A.    They're not staying in their lane of travel.  They

14  basically get out of their lane of travel.

15  Q.    Okay.  And then you said there was also a second violation

16  of failing to signal?

17  A.    Yes, ma'am.

18  Q.    What specifically did you observe?

19  A.    The vehicle failed to signal when changing lanes.

20  Q.    And that's required also by the Texas Transportation Code,

21  correct?

22  A.    Yes, ma'am.

23  Q.    What did you do once you made those observations?

24  A.    We requested the patrol unit to conduct a traffic stop on

25  Ms. Williams' vehicle.

Sedillo - Direct Examination - April 12, 2018

1   Q.   Now, why didn't you conduct a traffic stop?

2   A.   We don't have lights and sirens.  We're not marked.

3   Q.   Okay.  You're not in a marked unit.  Okay.

4   A.   And then if we made a traffic stop, then that would look

5   kind of odd.

6   Q.   Okay.  Were you wearing a uniform -- a police uniform?

7   A.   No, ma'am.

8   Q.   So you request the assistance of the marked unit, correct?

9   A.   Yes, ma'am.

10  Q.   Did you relay the information of the violations you had

11  observed to that unit?

12  A.   Yes, ma'am.

13  Q.   And that unit was actually occupied by two officers,

14  correct?

15  A.   Yes, ma'am.

16  Q.   Now, who were they?

17  A.   Officer Rodriguez and Officer Gonzalez.

18  Q.   Now, Midland doesn't have the luxury of having all patrol

19  units be manned by two officers, correct?

20  A.   Correct.

21  Q.   So why were there two folks in this unit?

22  A.   Ms. Gonzalez -- or Officer Gonzalez is a probationary

23  officer.  She is going through the FTO program.

24  Q.   So she is riding with a more seasoned or a training

25  officer; is that correct?

1  A.    Yes, ma'am.

2  Q.    After you related that information, what occurred?

3  A.    They conducted a traffic stop on the vehicle.

4  Q.    Did that traffic stop occur here in Midland, Texas?

5  A.    Yes, ma'am.

6  Q.    Who was determined to be the driver and the sole occupant

7  of the vehicle?

8  A.    Ms. Williams.

9  Q.    And the individual that you've indicated and named

10  throughout this hearing is Ms. Williams.  Do you see her

11  present here in the courtroom today?

12  A.    Yes, ma'am.

13  Q.    Will you identified her for the Court and the record.

14  A.    She is sitting there wearing a black shirt.

15         MS. YOUNG:  We would ask the record to reflect the

16  witness has identified the defendant.

17         THE COURT:  The record shall so reflect.

18  Q.    (BY MS. YOUNG)  Ultimately -- and for purposes of this

19  hearing, I'm only ask a few follow-up questions.

20         Ms. Williams was ultimately arrested for those

21  traffic offenses, correct?

22  A.    Yes, ma'am.

23  Q.    And that is permissible under Texas state law, correct?

24  A.    Yes, ma'am.

25  Q.    Now, not everybody that gets stopped for failing to

Sedillo - Direct Examination - April 12, 2018

1  maintain a single lane of traffic or failing to signal gets

2  arrested, correct?

3  A.    Correct.

4  Q.    Okay.  What occurred that made that decision be made by

5  the patrol officers and yourself?

6  A.    Basically, Officer Rodriguez relayed her behavior on the

7  stop, plus with the surveillance seeing her leaving the

8  address, all that into account, we believed that she was going

9  to be in possession of narcotics.  And so that's why I advised

10 Officer Rodriguez to arrest her for the traffic violations.

11 Q.    And once Ms. Williams was arrested, where was she taken?

12 A.    To the county jail.

13 Q.    And what was ultimately found by jail staff concealed

14 within her body?

15 A.    Crack cocaine.

16 Q.    And that was a quantity of crack cocaine that was

17 ultimately submitted to the Drug Enforcement Administration

18 laboratory?

19 A.    Yes, ma'am.

20 Q.    And, again, I know there are other facts; but for purposes

21 of what we're here for today, one follow-up question.  Would it

22 surprise you if the officers' video in the patrol car did not

23 show the traffic violations you just testified Ms. Williams

24 committed?

25 A.    No, ma'am.

Sedillo - Cross-Examination - April 12, 2018

1  Q.    Why not?

2  A.    Because they weren't anywhere to observe the violation.

3  They weren't in a position where they could observe the

4  violation of the vehicle.

5  Q.    So their recording couldn't record it because they didn't

6  see it.

7  A.    Correct.

8  Q.    They weren't in the same place -- the recording wasn't in

9  the same place.

10 A.    Correct.

11 Q.    Okay.

12         MS. YOUNG:  We're going to pass the witness, Your

13 Honor.

14         THE COURT:  Thank you.

15         Mr. Morgan, your witness.

16                   **CROSS-EXAMINATION**

17 BY MR. MORGAN:

18 Q.    Mr. Sedillo, do you have your report in front of you?

19 A.    Yes, sir.

20 Q.    There's a synopsis on January 2nd near the bottom?

21 A.    Yes, sir.

22 Q.    All right.  Please read the synopsis and the details,

23 including all the way down to the next page.

24         MS. YOUNG:  Your Honor, we're going to object to the

25 witness reading from the report.

Sedillo - Cross-Examination - April 12, 2018

1      MR. MORGAN:  I'll do it this way.

2      THE COURT:  Okay.  Go ahead.

3  Q.   (BY MR. MORGAN)  I'll represent to you I have a copy.

4  There is nothing in your own report -- the Matthew Sedillo

5  report that says that you saw Angela Williams failed to

6  maintain a single lane, is there?  They're supposed to be your

7  own observations in your report.

8  A.   Yes, it does.  "Advised they stopped them for those

9  violations."

10 Q.   Well, turn to the next page.

11 A.   Yes, sir.

12 Q.   First full paragraph says:  "Once Williams' vehicle

13 entered Midland County...," do you see that?

14 A.   Yes, sir.

15 Q.   It says you requested a marked patrol unit, and Officers

16 Rodriguez and Gonzalez advised they were in the area and could

17 assist, correct?

18 A.   Yes, sir.

19 Q.   It says:  Officers Rodriguez and Gonzalez conducted a

20 traffic stop on Williams' vehicle for failed or failure to

21 maintain single lane and failed or failure to -- single lane

22 changes, and gives the address.  Correct?

23 A.   Yes, sir.

24 Q.   That critical sentence there doesn't say that you saw her

25 not stay in her lane, does it?

Sedillo - Cross-Examination - April 12, 2018

1   A.   No, sir.

2   Q.   And it doesn't say that you saw that she failed to make a

3   single lane change, does it?

4   A.   No, sir, it doesn't.

5   Q.   Okay.  And, of course, you're trained to be thorough in

6   your reports, aren't you?

7   A.   Yes, sir.

8   Q.   And you're going to put the important details in your

9   reports, aren't you?

10  A.   Yes, sir.

11  Q.   Okay.  I'm going to represent to you -- and I brought a

12  staff member to show the video taken by Officer Gonzalez and

13  Rodriguez.  Would you have any disagreement with me that when

14  looking at Ms. Williams' small white Chevrolet, she does use a

15  turn -- a turn signal when she changes lanes.  Do you have any

16  disagreement with that?

17  A.   No, sir.

18  Q.   You don't have a disagreement, do you, that we never see

19  her go over a single marked lane, do we?

20  A.   I haven't observed the video so I can't say whether or

21  not, but I don't believe...

22  Q.   All right.  But just trying to save the Court some time,

23  we don't need to see the video, do we?

24  A.   No, sir, I don't think so.

25  Q.   Okay.  Don't need to see it because the video shows no

Sedillo - Redirect Examination - April 12, 2018

 1  violations of the traffic laws, right?

 2  A.    Not on the video, no, sir.

 3  Q.    All right.

 4         MR. MORGAN:  That's all.

 5         THE COURT:  Thank you.

 6         Redirect?

 7         MS. YOUNG:  Very briefly.

 8                    **REDIRECT EXAMINATION**

 9  BY MS. YOUNG:

10  Q.    Midland Police Department patrol units are equipped with

11  video recording devices, correct?

12  A.    Yes, ma'am.

13  Q.    Do they record all the time?  Every time the officer is

14  driving?

15  A.    Whenever they activate their lights is usually when they

16  turn on.

17  Q.    When the recording turns on.

18  A.    Yes, ma'am.

19  Q.    Which would alleviate, I guess, hours and hours of

20  recording of them just conducting patrol, correct?

21  A.    Correct.

22  Q.    Okay.  And I don't want to assume anything.

23         Now, these recording systems, in my experience -- and

24  correct me if I'm wrong -- you said that they initiate when the

25  lights are turned on or emergency lights are turned on or

 1  sirens, but they actually can backup a little bit.

 2  A.   Yes, ma'am.

 3  Q.   What does the Midland Police Department have?

 4  A.   I believe it goes back, I believe it's 30 to 60 seconds

 5  prior.

 6  Q.   Okay.  To the activation.

 7  A.   Correct.  Yes, ma'am.

 8  Q.   Now, these patrol units are equipped with these cameras,

 9  correct?

10  A.   Yes, ma'am.

11  Q.   Now -- and I'm trying to be as specific as possible.

12  These aren't cameras that can see and record with any clarity

13  or detail miles away, correct?

14  A.   Correct.

15  Q.   They are typical recording devices, correct?

16  A.   Correct.

17  Q.   Once someone is approaching or a vehicle is being followed

18  by a patrol unit and a recording initiates or begins, the

19  distance for the recording to be able to see and record and

20  capture a vehicle, the driver of the vehicle also must see the

21  patrol unit.  Is that a fair statement?

22  A.   Yes, ma'am.

23  Q.   If they're right behind each other or driving in tandem,

24  correct?

25  A.   Correct.

Sedillo - Redirect Examination - April 12, 2018

1  Q.   And you said you've been a patrol officer for how many

2  years?

3  A.   11 years.

4  Q.   In your training and experience -- well, let me ask one

5  other question.  Part of that you were actually on patrol,

6  correct?

7  A.   Yes, ma'am.

8  Q.   I know I detailed for the record your investigation,

9  experience in detectives, but you were actually on patrol,

10  correct?

11  A.   Yes, ma'am.

12  Q.   Conducting traffic stops?

13  A.   Yes, ma'am.

14  Q.   In your training and experience, after you pulled in

15  behind someone who you had observed previously commit a traffic

16  violation, did their driving patterns or behavior change?

17  A.   Yes, ma'am.

18  Q.   How?

19  A.   They were driving very good.

20  Q.   Okay.  Would that be in your training and experience your

21  opinion.

22  A.   Yes, ma'am.

23  Q.   So are you surprised if after this unit got behind

24  Ms. Williams' vehicle she then complied with the two specific

25  violations you had observed?

USA vs. Williams - Motion to Suppress - April 12, 2018

1  A.    I wouldn't be surprised, no, ma'am.

2            MS. YOUNG:  No further questions.

3            THE COURT:  Recross?  Nothing further?

4            MR. MORGAN:  No recross.

5            THE COURT:  Okay.  Thank you.

6            Detective Sedillo, you may step down.  Thank you,

7  sir.

8            THE WITNESS:  Thank you, sir.

9            MS. YOUNG:  Your Honor, given the limited scope of

10  the Motion to Suppress, the United States has no further

11  witnesses.

12           THE COURT:  Thank you.

13           Mr. Morgan.

14           MR. MORGAN:  Your Honor, I have no witnesses.  I

15  definitely do have some argument and some case law at the

16  proper time.

17           THE COURT:  Go right ahead, sir.

18           MR. MORGAN:  The stop was for two alleged traffic

19  violations, for nothing else.  Of course, the burden of proof

20  is on the government by a preponderance of the evidence,

21  probable cause, or at least reasonable suspicion based on

22  specific articulable facts, which I note in my motion.

23           Now, what do we have in this evidence when we

24  represent these cases?  We have Mr. Sedillo stating he saw

25  these violations apparently before he ever radioed

USA vs. Williams - Motion to Suppress - April 12, 2018

1  Officers Gonzalez and Rodriguez presumably to stop this

2  vehicle.

3          Very importantly, he's trained to be thorough in his

4  reports.  The important information is going to be included.

5  There is nothing in Detective Sedillo's report that says that

6  he himself saw any traffic violation.  It doesn't say he saw my

7  client failed to stay in a single marked lane; does not state

8  in his own report that he saw my client not use a turn signal

9  when changing lanes.

10          Now, could I approach the bench?

11          THE COURT:  Yes, sir.

12          MR. MORGAN:  I have two cases to give to the Court

13  and to the United States Attorney.  If I could approach the

14  bench.

15          THE COURT:  Sure.

16          Thank you, Mr. Morgan.

17          MR. MORGAN:  These are *Hernandez vs. State*,

18  983 S.W.2d Page 867 from the Austin Court of Appeals and *State*

19  *vs. Bernard* from the 14th District Court of Appeals in Houston,

20  a January 23, 2018, opinion involving failure to stay in a

21  single-marked lane.

22          Now, the Hernandez case is interesting to me because

23  we have a defendant who had been convicted for driving while

24  intoxicated.  Got the conviction reversed because the officer

25  had no right to stop Mr. Hernandez, the defendant, even though

Case 7:18-cr-00037-DC   Document 82   Filed 08/24/18   Page 33 of 52

33

USA vs. Williams - Motion to Suppress - April 12, 2018

1  he apparently went across the line -- went out of his lane for

2  18 to 24 inches.

3          Mr. Sedillo said she failed to stay in a

4  single-marked lane.  Didn't say how far she went over the line.

5  I assume she barely went over the line.  It doesn't say she

6  went over 18 to 24 inches.  Nor did Mr. Sedillo state that when

7  she went over the line, it was unsafe.  If the stop was illegal

8  in Hernandez, it's illegal here.

9          And we have *State vs. Bernard*, this very recent case,

10  Houston Court of Appeals.  I believe that this Mr. Bernard,

11  Albert Bernard, the appellant, he went over the line 6 to

12  8 inches at one point and about 4 inches another time.  That's

13  it.  That stop was found to be illegal by the Court of Appeals.

14          We have nothing from Mr. Sedillo about how far she

15  went over the line.  Was it 2 inches?  3 inches?  We have no

16  videotape.  No evidence it was unsafe at all, especially

17  looking at the Hernandez case, but both cases.

18          And as far as not using a turn signal, which lane was

19  it?  You know, the inside lane?  The outside lane?  Which lane

20  was it?  I can assure the Court when I saw the tape that --

21  made by the two lady patrol officers, she sure used her turn

22  signal, Your Honor.  I didn't see any failure to stay in a

23  single-marked lane.  The video, we do have, shows no violation

24  at all.

25          And it is their burden of proof.  Officer Sedillo

USA vs. Williams - Motion to Suppress - April 12, 2018

1   never said it was unsafe how far she went over; and on the

2   video, she sure used her turn signal before she ever changed

3   lanes.

4          In looking at the Hernandez case, the Bernard case,

5   on this testimony, coupled with the fact that Mr. Sedillo has

6   absolutely nothing in his own report that he personally

7   observed my client ever leave her lane or that he personally

8   ever saw her not use a turn signal.  We don't think they met

9   the burden of proof.

10          And I would note, Your Honor, the 1965, United States

11   Supreme Court case, I believe it is *United States vs. Ventresca*

12   that says this:  If it is a very, very close case or even a tie

13   in terms of believability and the evidence, if there is a

14   warrant, the prosecution wins.  If there is no warrant, the

15   defense wins.

16          So I do invoke *United States vs. Ventresca*.  I don't

17   know how far she went over the line at all.  Nor that it was

18   unsafe.  We see no violations on the tape.  We don't know where

19   she was going when she supposedly failed to use the turn

20   signal, which lane, into that lane?  Where?  It is a conclusion

21   she didn't use her turn signal with no Factual Basis.

22          It is not our burden of proof.  It is the

23   government's burden of proof.  We ask this Motion to Suppress

24   to be granted.  In that regard, the stop being illegal, the

25   detention illegal, the search inside the jail for which she had

USA vs. Williams - Motion to Suppress - April 12, 2018

1  on her person is illegal, and we ask this motion be granted.

2  And this applies to Count One with regard to this Motion to

3  Suppress, which will pretty well bar Count One from being

4  prosecuted.

5           THE COURT:  Ms. Young.

6           MS. YOUNG:  And, Your Honor, I have seen these cases

7  before.  They are cases that were presented to the Court I

8  believe from the Court of Appeals here in Texas.  And based on

9  the motion the United States received from the defendant, we

10  presented the evidence as succinctly as we possibly could

11  trying to guess what the issues were going to be.

12           You know, that aside, the testimony from the --

13  before the Court is that the Midland Police Department received

14  information that Ms. Williams was selling crack cocaine.  They

15  made a purchase of crack cocaine in December of 2017.

16           Then the events regarding this traffic stop occurred

17  January 2, 2018.  As the detective testified, his observation

18  was that the vehicle driven by Ms. Williams committed two

19  violations.  I specifically asked him if he observed violations

20  of the Texas Transportation Code, and he detailed those.

21           The fact that his report says in his recitation of

22  the facts and the summary and synopsis -- Mr. Morgan repeated

23  to the Court multiple times and on cross-examination that

24  nowhere in the report does it say.  Well, it does not say, "I

25  observed this."  But in the full totality and the testimony

USA vs. Williams - Motion to Suppress - April 12, 2018

1   here before the Court, it reads and says that he was following

2   the vehicle.  Requested assistance.  The vehicle was stopped.

3   And his testimony here today has been clear.

4          I don't think you can make an argument to this Court

5   that he didn't see it just because I say he didn't see it.  Or

6   he didn't see it because he didn't write, "I saw this."  I

7   don't think -- I don't -- that's not evidence.  Now, attorneys

8   argue all the time, just the same as I'm arguing right now, but

9   that's not evidence.  So the evidence before the Court is that.

10          Also of significance -- and I made sure to cover this

11   with the detective there on the stand.  I did not include it in

12   our response because, again, I was trying to decipher what the

13   issues were.  But I did provide the Court with the recitation

14   of facts and did have the detective go into those facts.

15   Because the fact that these detectives had made a purchase of

16   cocaine base, crack, from Ms. Williams at her residence here in

17   Midland, they continued their investigation.  Followed her to

18   Odessa.  Contacted DEA agents regarding the specific area in

19   Odessa.  Observed what the detective testified here before this

20   Court.  And his training and experience was consistent with a

21   pattern of narcotics activity.  A short arrival at the

22   residence, a short period of time, and then travel back and

23   forth.  And that at that point in time, he had made the

24   decision he wanted to initiate a traffic stop.

25          This is not a question of the Court where the Court

USA vs. Williams - Motion to Suppress - April 12, 2018

1  has to proceed under analysis of, well, okay, what knowledge

2  did he have right then?  Did he have reasonable suspicion to

3  believe that a narcotics transaction had occurred.  We could go

4  down that road.  I don't think it is necessary.  We didn't

5  brief it that way because I think the evidence is extremely

6  clear as to what the officer observed and what he did.

7         But I point that out and had him clarify those things

8  for the record because there is a whole -- and the totality of

9  the circumstances and the information they received, these

10 officers were proceeding.  And for legal analysis -- and the

11 government will be happy to supply supplemental briefing on

12 that -- but there would be an alternative theory here.  I don't

13 think that's necessary, and we're not asking the Court to rule

14 on that, but we would be happy to provide supplemental briefing

15 in regards to that.

16        Additionally, we'd be happy to provide supplement

17 briefing, given the way the testimony was here today, in

18 regards to collective knowledge and collective knowledge

19 doctrine.  That's well-settled within the Fifth Circuit.

20        And I actually thought of that as I was walking over

21 to my car to come over to court today.  That is an issue that

22 has actually been heard here in this court and then by the

23 Fifth Circuit in *United States vs. Booker Anderson, Jay Powell,*

24 *and April Marie Akin* in regard to collective knowledge.  That

25 went to the Fifth Circuit, and there is -- there's many, many

USA vs. Williams - Motion to Suppress - April 12, 2018

1    issues in that case.  That case was a trial.

2          It was the one that I could think of as quickly

3    walking over here thinking trying to, again, anticipate some

4    potential issues for the Court that might be raised today.  I

5    think that has come up to a degree in that Detective Sedillo

6    didn't have a recording device and he relayed information and

7    the recording device we have doesn't show a violation.

8          Well, the Fifth Circuit has said collective knowledge

9    that one officer's observation of traffic violation or

10   narcotics activity can be relayed, and those encounters can

11   occur based on that.  So, again, the United States would be

12   happy to provide supplemental briefing on that as well.

13         This is the case where the government hasn't only met

14   its burden, the government believes -- and we put forth to the

15   Court -- it could meet its burden in multiple ways.  And while

16   I appreciate Mr. Morgan's cases he talked about, well, the

17   officer didn't testify that this violation of the

18   Transportation Code, how far did he go over, how far did he

19   not, and the government hasn't met its burden, I did not hear

20   anything in regards to the alleged violation regarding failing

21   to signal, intent to change lane.

22         And so even if the Court were somewhat persuaded by

23   this Texas state case law -- which again I will submit I have

24   not read.  I just received it here today -- there is still a

25   traffic violation that the officer testified that he observed.

USA vs. Williams - Motion to Suppress - April 12, 2018

1      Based on those reasons, we would ask that the Motion
2  to Suppress be denied.

3      THE COURT:  Thank you.

4      Yes, sir, Mr. Morgan.

5      MR. MORGAN:  The stop is for these two traffic
6  violations, not for what happened December 5th.  That's not
7  involved in the stop.

8      I would note, Your Honor, with regard to this house
9  or this street on Wabash in Odessa, there has been no
10  testimony -- it's their burden of proof -- there has been any
11  arrest in the last three months for anyone involved in
12  illegally drugs on Wabash, not for anyone inside this house,
13  not anyone.  We don't know it's a high crime area.  That's a
14  conclusion with no factual basis at all.

15      As far as Mr. Sedillo stating that, well, she changed
16  lanes and didn't use her turn signal, that's a conclusion but
17  no factual basis.  It is their burden of proof.  What lane?
18  Left lane to the right lane?  How?  What block?  Where?  It
19  should have been a factual basis.  There is none.

20      Was it before she got to Loop 250?  Was it when she
21  was going down I-20?  Where?  That's their burden of proof.  We
22  don't think they met their burden of proof, and December 5th is
23  not why my client was stopped.  And we'll renew our Motion to
24  Suppress be granted.

25      THE COURT:  Thank you.

Case 7:18-cr-00037-DC   Document 82   Filed 08/24/18   Page 40 of 52

40

USA vs. Williams - Motion to Suppress - April 12, 2018

1          I think that the issues are clear.  I will allow some

2    time for supplemental briefing, if the parties would like to

3    make any supplemental brief or submit any supplemental brief.

4    Let's say next Wednesday at 5:00 and that gives you --

5          Are you out of town?

6          MS. YOUNG:  And I only offered that, I mean, if the

7    Court would request it.  If the Court requests supplemental

8    briefing --

9          THE COURT:  I don't think that we need supplemental

10   briefing on collective knowledge doctrine.  I wouldn't mind --

11   I know you haven't read -- nor have I -- these two state cases.

12   Perhaps some briefing distinguishing those for the Court in

13   your opinion, and we'll do the same.

14         MS. YOUNG:  We will attempt to do that.  My only --

15   and not to sound tacky or to be ugly, it's very difficult for

16   the United States to bring a witness and not spend two hours

17   talking about things if we have no idea from the motion what

18   we're going after.

19         THE COURT:  Right.

20         MS. YOUNG:  And so I have no problem recalling

21   Detective Sedillo and having him offer these facts before the

22   Court.  But it is a little difficult to try to navigate what

23   the issues are when there's not any facts or any case law or

24   anything provided.  So we will provide supplemental briefing,

25   but we apologize to the Court that we can't do this ahead of

1  time.

2          THE COURT:  Would you rather recall Detective Sedillo

3  now?

4          MS. YOUNG:  I would prefer that, Your Honor.

5          THE COURT:  Let's just do that.

6          MS. YOUNG:  Thank you, Your Honor.

7          THE COURT:  Sir, you've been previously sworn.

8          Go right ahead, Ms. Young.

9          MS. YOUNG:  Thank you, Your Honor.

10                 **REDIRECT EXAMINATION CONTINUED**

11  BY MS. YOUNG:

12  Q.   Your understanding regarding Texas Transportation Code

13  Section 544.060(a)(1)(2) in regards to failing to maintain

14  within a single lane of traffic.  Are you familiar with that

15  traffic code section and law?

16  A.   Yes, ma'am.

17  Q.   Has that changed significantly since you've been a police

18  officer here in Midland, Texas?

19  A.   No, ma'am.

20  Q.   Okay.  And in regards to what you observed, please detail

21  for the Court what you observed and where you observed it.

22  A.   Okay.  I observed failed to maintain single lane and

23  failed to change -- failed to signal with change lanes.  And

24  this occurred in the 2400 block of south Loop 250.

25  Q.   Okay.  We're going to talk about each one specifically.

Sedillo - Redirect Examination Continued - April 12, 2018

1   A.   Yes, ma'am.

2   Q.   You're familiar -- you said that first section of the

3   transportation code dealing with -- what is commonly called

4   failing to maintain a single lane of traffic, or failure to

5   maintain; is that fair?

6   A.   Yes, ma'am.

7   Q.   Okay.  Does it require an individual who's operating a

8   motor vehicle to drive -- and I'm quoting -- as nearly as

9   practical entirely within a single lane?

10  A.   Yes, ma'am.

11  Q.   And may not move from the lane unless that movement can be

12  made safely.

13  A.   Correct.

14  Q.   Is that your understanding?

15  A.   Yes, ma'am.

16  Q.   Okay.  Now, what specifically -- we're just going to talk

17  about that first.

18  A.   Okay.

19  Q.   What specifically did you observe the vehicle driven on

20  Loop 250 here in Midland, Texas, do that led you to believe a

21  violation of that specific transportation code section had

22  occurred?

23  A.   It was driving in the outside lane on the loop in front of

24  the DPS office, which is the 2400 block of south Loop 250.  It

25  moved over and basically drove in the center between the inside

Sedillo - Redirect Examination Continued - April 12, 2018

1  and outside lane and just kind of stayed there for a few

2  seconds and then it moved back over to the outside lane.  It

3  continued for a few more seconds, and then it moved over to the

4  inside lane without signaling.

5  Q.    Okay.  Now that's the second part, correct?

6  A.    Okay.  Yes, ma'am.

7  Q.    That's okay.  We're going to cover it.  I just want to

8  make sure we're clear.

9  A.    Yes, ma'am.

10  Q.    So that is what you were alleging occurred, correct?

11  A.    Yes, ma'am.

12  Q.    Now, what is -- again, for purposes of the record, what is

13  Loop 250?

14  A.    It is a highway.

15  Q.    Okay.  And specifically what I'm asking:  It's here in

16  Midland, Texas, correct?

17  A.    Yes, ma'am.

18  Q.    You've testified to that.

19  A.    Yes, ma'am.

20  Q.    What kind of highway is it, in regards to divided:  one

21  lane, two lane, four lanes?

22  A.    It is four lanes divided.

23  Q.    Okay.  Two traveling each direction, correct?

24  A.    Correct.

25  Q.    And it's called a loop because it does what?

Sedillo - Redirect Examination Continued - April 12, 2018

1  A.    It makes a loop.

2  Q.    Around what?

3  A.    Around Midland.

4  Q.    Okay.  And, again, for the record, I'm trying to be as

5  clear as possible.

6         Is it the major -- one of the major thoroughfares to

7  drive around the city of Midland?

8  A.    Yes, ma'am.

9  Q.    Do we have other loops or beltways or other things that

10 circle the entire city?

11 A.    No, ma'am.

12 Q.    Okay.  Now, you said you were on -- you had patrolled and

13 done traffic before, correct?

14 A.    Yes, ma'am.

15 Q.    In your opinion, is Loop 250 the most heavily traveled

16 road in the city of Midland?

17 A.    Yes, ma'am.

18 Q.    And why is that?

19 A.    We have a lot of accidents, and there is always a lot of

20 cars on the loop.

21 Q.    Okay.  So, in your opinion, is it unsafe to drive in both

22 lanes going one direction on Loop 250 for a period of time?

23 A.    Yes, ma'am.

24 Q.    Okay.  Now, after you observed that, you said you observed

25 something else.

Sedillo - Redirect Examination Continued - April 12, 2018

1    A.    Yes, ma'am.

2    Q.    What was that?

3    A.    Failed to signal when changing lanes.

4    Q.    Are you familiar with Texas Transportation

5    Code 545.104(a)?

6    A.    Yes, ma'am.

7    Q.    And are you familiar with it saying an operator shall use

8    the signal authorized by Section 545.106 to indicate an

9    intention to turn, change lanes, or start from a parked

10   position?

11   A.    Yes, ma'am.

12   Q.    Is that what you recall it to be?

13   A.    Yes, ma'am.

14   Q.    And it's a violation if you don't comply with that,

15   correct?

16   A.    Yes, ma'am.

17   Q.    What specifically did you observe the vehicle driven by

18   Ms. Williams do and where did it occur?

19   A.    It occurred in the same block, the 2400 block of south

20   Loop 250.   It was in the outside lane, and it moved to the

21   inside lane, and it never signaled when it changed lanes.

22   Q.    And on this instance, did it then -- the vehicle return

23   back to the outside lane as you had detailed before when the

24   vehicle was in the middle or did it remain in that inside lane?

25   A.    It remained in that inside lane.

Sedillo - Redirect Examination Continued - April 12, 2018

1  Q.    Okay.  At any time was there a turn indicator utilized

2  when that vehicle changed from the outside lane to the inside

3  lane?

4  A.    No, ma'am.

5  Q.    Based on your training and experience, is that a violation

6  of the transportation code section I just -- we just went over?

7  A.    Yes, ma'am.

8  Q.    Okay.  Both of those observations were then related to

9  whom?

10 A.    Officer Rodriguez.

11 Q.    Okay.

12        MS. YOUNG:  May I have just a moment, Your Honor?

13        THE COURT:  Yes, ma'am.

14 Q.    (BY MS. YOUNG)  Is there a difference between a vehicle

15 that drifts within its own lane of traffic and a vehicle that

16 crosses into another lane?

17 A.    Is there a difference?

18 Q.    Right.

19 A.    Yes, ma'am.

20 Q.    And I'm not trying to trick you.  I'm just asking.

21 A.    Yes, ma'am.

22 Q.    I'm sorry.  I know we didn't go over this.

23        Is it a violation of failing to maintain a single

24 lane of traffic if you, as a drive of a vehicle, go from the

25 shoulder solid line close over to the divided line -- the

Sedillo - Redirect Examination Continued - April 12, 2018

1  divided lane but don't go over?

2  A.   No, ma'am.

3  Q.   Even if you bounce all the way down Loop 250 and do that.

4  A.   No, ma'am.

5  Q.   That's not a violation, correct?

6  A.   No, ma'am.

7  Q.   Okay.  And, in fact, would that still be considered

8  staying in your lane and safe driving?

9  A.   In my opinion, no.

10 Q.   Okay.  But could you stop them for that violation of this

11 transportation code?

12 A.   I don't think so, no, ma'am.

13 Q.   Okay.  Is that what you observed the vehicle driven by

14 Ms. Williams do?

15 A.   Weave back and forth in the lane?

16 Q.   Correct.

17 A.   No, ma'am.

18          MS. YOUNG:  I'll pass the witness.

19          THE COURT:  Thank you.

20          And, Detective, just -- I know -- I think it is clear

21 but let me just make sure.  You're in an undercover -- or an

22 unmarked, I should say, car at the time.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Did you not have a dash cam?

25          THE WITNESS:  No, sir.

1          THE COURT:  Okay.  And so you just relayed that to

2   Rodriguez.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  I see.  Okay.  I just wanted to make

5   sure.

6          Mr. Morgan, cross?

7              **RECROSS-EXAMINATION CONTINUED**

8   BY MR. MORGAN:

9   Q.   Was Ms. Williams going north on Loop 250?

10  A.   Yes, sir.

11  Q.   And those lanes are both going north, correct?

12  A.   Yes, sir.

13  Q.   There was no oncoming traffic at all, was there?

14  A.   Not coming toward her, no, sir.

15  Q.   Okay.  There is nothing in your report regarding the

16  amount of traffic, is there?

17  A.   No, sir.

18  Q.   Nothing in your report this driving was unsafe, is there?

19  A.   No, sir.

20  Q.   Again, nothing in your report that you saw of any

21  violations, correct?  We've gone over that before, right?

22  A.   It doesn't state that I personally saw them.

23  Q.   In the rules and regulations of the Midland Police

24  Department, aren't you supposed to wear a microphone either on

25  your lapel or duty belt or something?

Sedillo - Further Redirect Examination - April 12, 2018

1  A.   No, sir.  Not in our unit, no, sir.

2  Q.   Okay.  Now, you could have called other officers and/or

3  the dispatcher and said, This vehicle was driving in

4  such-and-such a manner in the -- what, 2450 block or whatever

5  it is, of Loop 250 -- in other words, you could have been

6  specific about the violations you saw to other officers and the

7  dispatcher, correct?

8  A.   I advised the officers of the violation, yes, sir.  I

9  guess I'm not understanding your question.

10  Q.   Well, is there a recording as to what you told these two

11  lady officers?

12  A.   I have no idea, sir.

13  Q.   So you don't wear a microphone at all?

14  A.   No, sir.

15  Q.   Okay.  And we have nothing that's audible that indicates

16  exactly that we can hear in this courtroom about how she drove,

17  is there, specifically?

18  A.   Not to my knowledge, no sir.

19          MR. MORGAN:  That's all.

20          THE COURT:  Redirect?

21                   **FURTHER REDIRECT EXAMINATION**

22  BY MS. YOUNG:

23  Q.   I'm going to follow that up with:  You're speaking out

24  loud, correct?

25  A.   Yes, sir.

USA vs. Williams - Motion to Suppress - April 12, 2018

1  Q.   I'm ma'am.

2  A.   Yes, ma'am.  Sorry.

3  Q.   That's okay.  But you're testifying out loud --

4  A.   Yes, ma'am.

5  Q.   -- to what you observed and occurred.

6  A.   Yes, ma'am.

7  Q.   Okay.

8           MS. YOUNG:  No further questions.

9           THE COURT:  Thank you.

10           Anything further, Mr. Morgan?

11           MR. MORGAN:  Nothing further.

12           THE COURT:  Now, you may finally step down.  Thank

13  you, Detective Sedillo.

14           THE WITNESS:  Thank you, sir.

15           THE COURT:  Anything further, Ms. Young?

16           MS. YOUNG:  Nothing further, Your Honor.

17           THE COURT:  All right.  Very well.

18           Unless there is anything further, Mr. Morgan?

19           MR. MORGAN:  No, Your Honor.

20           THE COURT:  Okay.  I think it is clear.  I'll take it

21  under advisement.  I will enter an order soon.  It sounds like

22  we've got a little time, but just because of the impending

23  grand jury.  I guess the -- well, I won't touch that.  We've

24  got some things coming up.

25           Ms. Williams, you're on bond right now.  I'm told

USA vs. Williams - Motion to Suppress - April 12, 2018

1  that you are doing well on bond.  Continue to do well, all

2  right, and there won't be any issues.  If there are any issues,

3  then, you know, that could hurt you, as far as staying out, as

4  far as if you are -- if you are convicted, it can hurt, you

5  know, later on just for acceptance of responsibility credit,

6  things like that.  It may or may not matter, but I would like

7  you to be able to stay on bond.  I think you would too.

8         And so Ms. Mata, the Pretrial Services officer, has

9  told me that you've been doing fine.  You've been compliant.

10  You've been doing what you're told to do.  So I appreciate

11  that.

12         Mr. Morgan, anything further today on behalf of the

13  defense?

14         MR. MORGAN:  No, Your Honor.

15         THE COURT:  And, Ms. Young, for the government?

16         MS. YOUNG:  Nothing further, Your Honor.

17         THE COURT:  Thank y'all so much.  We'll adjourned,

18  and I will see you again soon.  Thank you.

19         MR. MORGAN:  Thank you.

20         (Proceedings concluded at 3:54 p.m.)

21                * * * * * *

22

23

24

25

USA vs. Williams - Motion to Suppress - April 12, 2018

1              **C E R T I F I C A T E**

2

3          I, ANN M. RECORD, RMR, CRR, CMRS, CRI, Federal

4    Official Court Reporter, certify that the foregoing is a

5    correct transcript from the proceedings in the

6    above-entitled matter.

7

8

9

10

11                         _____/s/Ann M. Record_____
                Date: 8/24/2018    Ann M. Record, RMR, CRR, CMRS, CRI
12                                 United States Court Reporter
                                   200 East Wall Street, Suite 222
13                                 Midland, Texas  79701
                                   Telephone:  (432) 685-0361
14                                 e-mail:  ann_record@txwd.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25